863 A.2d 1065

ESTATE OF F.K.,[1] PETITIONER–APPELLANT, v. DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES AND OCEAN COUNTY BOARD OF SOCIAL SERVICES, RESPON-DENTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 27, 2004—Decided January 4, 2005.

---

[1] While this appeal was pending, F.K., the institutionalized spouse, died. By order dated March 24, 2004, we allowed substitution of the Estate of F.K. as the petitioner.

Before Judges CUFF, WEISSBARD and KIMMELMAN.

*Shirley B. Whitenack* argued the cause for appellant (*Schenck, Price, Smith & King,* attorneys; *Ms. Whitenack,* of counsel; *Peter A. Marra and James A. Kassis,* on the brief).

*M. Elisabeth Doyle,* Deputy Attorney General, argued the cause for respondent Division of Medical Assistance and Health Services (*Peter C. Harvey,* Attorney General, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel; *Tina Kashishian Sickler,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

CUFF, J.A.D.

This appeal presents several issues concerning qualification for Medicaid benefits for a spouse who requires care in a nursing facility while the other spouse remains in the community. We consider a regulation adopted by the State Medicaid agency to control allegedly abusive use of annuities to shelter marital assets. Petitioner challenges the regulation that allows the purchase of an annuity but limits the amount of marital assets that may be used to purchase the annuity to the current community spouse resource allowance, which was $91,000 at the time the institutionalized spouse applied for benefits. Petitioner contends that the regulation is invalid because it is more restrictive than federal law. Petitioner also contends that the agency decision that the annuity is an available asset because it may be sold on a secondary market is contrary to law and unsupported by any facts in the record. We agree and reverse.

In May 2000, F.K. became a resident of the Holiday Care Center in Toms River. He suffered from Alzheimer's disease and his wife, H.K., was no longer able to care for him in their home. In accordance with the regulations in effect at that time, F.K. and H.K. purchased an actuarially sound commercial annuity for $273,538. By its terms, the annuity is irrevocable and non-assignable. H.K. is the sole beneficiary of the income. Although not required at the time of purchase, in apparent anticipation of the adoption of a proposed rule, the Department of Human Services, Division of Medical Assistance & Health Services (DMAHS) was named first remainder beneficiary.[2] The annuity was partially funded on May 28, 2001, and fully funded by June 11, 2001.

---

[2] The validity of *N.J.A.C.* 10:71–4.10(f), which requires the State of New Jersey to be named as the first remainder beneficiary, is before this court in *A.B. v. Division of Medical Assistance and Health Services*, A–493–02T2. Oral argument was conducted on November 30, 2004.

On June 5, 2000, DMAHS proposed new rules regarding qualification for Medicaid. The proposed regulations, including *N.J.A.C.* 10:71–4.10, concern the transfer of assets and the treatment of annuities for the purpose of determining an applicant's eligibility for Medicaid benefits and respond to the agency's concern that annuities were being used to shelter large sums of money. Following an extended comment and review period, DMAHS adopted *N.J.A.C.* 10:71–4.10 on June 18, 2001. The notice stated that the regulation was effective immediately. *N.J.A.C.* 10:71–4.10(p)2i provides

(p) Annuity provisions shall be as follows:

\* \* \*

2. Any commercial annuity purchased which is not actuarially sound, based on the life expectancy of the individual (as set forth in life expectancy tables published by the Health Care Financing Administration) or term certain (the length of payout is specified and payment does not terminate upon the death of the annuitant) shall be considered to be a transfer of an asset in order to qualify for Medicaid benefits. In the event that an annuity is not actuarially sound at the time of purchase, the amount that shall be considered to have been transferred at less than fair market value shall be that proportion of the annuity purchase price which is not actuarially sound. This shall be the same proportion as the amount by which the pay-out period exceeds the life expectancy of the individual at the time of the annuity purchase. (Life expectancy divided by the pay-out period of the annuity multiplied by the purchase amount of the annuity is subtracted from the total amount of the annuity to determine the uncompensated value.)

i. If an annuity is purchased for a community spouse with any portion of the couple's funds and the annuity purchase price exceeds the amount of the protective share of the community spouse, as determined in accordance with the procedures specified at N.J.A.C. 10:71–4.8(a), the amount in excess of the community spouse's protected share shall be counted in determining the applicant's eligibility.

On July 25, 2001, approximately thirty-seven days after the effective date of the regulation, F.K.'s former counsel submitted an application for Medicaid benefits on behalf of F.K. On August 13, 2001, the Ocean County Board of Social Services (OCBSS) denied F.K.'s Medicaid application. Relying on *N.J.A.C.* 10:71–4.10(p)2i, the OCBSS determined that the annuity was a countable asset and F.K.'s and his wife's combined resources exceeded the $91,000 community spouse resource allowance (CSRA).

F.K. appealed. The matter was referred to the Office of Administrative Law and treated as a contested case. At the hearing before an Administrative Law Judge (ALJ), the parties stipulated that the annuity purchased by F.K. for the benefit of his wife complied with the regulations in effect at the time of purchase. It is undisputed that the annuity is actuarially sound. F.K. disputed the applicability of the newly adopted regulations to him and also argued that the regulation was invalid because it violated federal law. Following the hearing, the ALJ issued an Initial Decision in which he found that the regulations were effective on September 27, 2001; therefore, F.K.'s application for Medicaid benefits was governed by the regulations in effect at the time of issuance of the annuity. Because the parties stipulated that the annuity complied with the regulations in effect at the time of purchase, the ALJ recommended that the application for benefits should have been granted.

On September 12, 2002, the Director of DMAHS issued a Final Decision that reversed the Initial Decision and affirmed the OCBSS denial of benefits. She found that the regulation complied with the procedural requirements of the Administrative Procedure Act, that the regulation adopted June 18, 2001 applied to the application filed by F.K., and that the annuity was correctly included in the resource determination. The Director also held that the regulation did not violate federal law.

F.K. filed a timely notice of appeal. While the appeal was pending, we remanded the matter to DMAHS for further consideration in light of an October 21, 2002 letter that addressed the validity of the newly adopted regulations, particularly *N.J.A.C.* 10:71–4.10(p)2i, written by Thomas Hamilton, the director of the federal program charged with implementation and oversight of the federal Medicaid program.[3] Hamilton opined that limitation of

---

[3] Hamilton was the Director for the Disabled and Elderly Health Programs Group, Center for Medicaid and State Operations, Department of Health and Human Services.

the amount of a couple's resources that can be used to purchase an annuity for benefit of the community spouse to the CSRA level is not permitted by federal law. On July 3, 2003, the Acting Director of DMAHS ordered that the Hamilton letter should be included in the record but concluded that he was not required to defer to the legal opinion expressed in the letter. He further found that the annuity purchased by F.K. was an available asset because it was readily marketable on a secondary market for such annuities. We commence our consideration of this appeal with a review of the Medicaid program.

Medicaid is a cooperative federal-state program that is funded in large part by the federal government and administered by the states "so that eligible needy persons may be reimbursed for the cost of medical care." *A.K. v. Div. of Med. Assistance and Health Servs.*, 350 *N.J.Super.* 175, 178, 794 *A.2d* 835 (App.Div.2002) (citing 42 *U.S.C.A.* §§ 1396a to 1396v). "While state participation in the program is voluntary, participating states must adopt plans that comply with certain requirements imposed by federal statutes and regulations." *Mertz v. Houstoun*, 155 *F.Supp.2d* 415, 420 (E.D.Pa.2001) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 *U.S.* 498, 502, 110 *S.Ct.* 2510, 2513, 110 *L.Ed.2d* 455, 462 (1990)). The program is " 'basically administered by each state within certain broad requirements and guidelines.' " *Ibid.* (quoting *West Virginia Univ. Hosps., Inc. v. Casey*, 885 *F.2d* 11, 15 (3d Cir.1989), *aff'd*, 499 *U.S.* 83, 111 *S.Ct.* 1138, 113 *L.Ed.2d* 68 (1991)). "The states have significant discretion to design programs, but those programs must be consistent with federal law." *A.K., supra*, 350 *N.J.Super.* at 178–79, 794 *A.2d* 835 (citations omitted). States that choose to participate are required to comply with the Medicaid Act and the regulations adopted by the Secretary of Health and Human Services, and "must prescribe a single standard for determining income and resource eligibility in providing assistance to medically needy individuals[.]" *Mistrick v. Div. of Med. Assistance and Health Servs.*, 154 *N.J.* 158, 163, 712 *A.2d* 188, (1998). "Each applicant must satisfy the criteria for eligibility established

by the state in which the applicant lives." *Id.* at 166, 712 *A.*2d 188 (citations omitted).

New Jersey participates in the Medicaid program through the enactment of the New Jersey Medical Assistance and Health Services Act, *N.J.S.A.* 30:4D–1 to –19.1. The Commissioner of the Department of Human Services has adopted regulations governing participation in New Jersey's "Medicaid Only" program, including income and resource eligibility standards. *N.J.A.C.* 10:71–1.1 to –9.5. A resource shall be considered available to an individual when the person has the "right, authority, or power to liquidate real or personal property, or his or her share of it" or where resources have been "deemed available to the applicant." *N.J.A.C.* 10:71–4.1(c)1 and 2. Unless specifically excluded, all liquid and non-liquid resources are considered countable in determining eligibility. *N.J.A.C.* 10:71–4.1(b); *N.J.A.C.* 10:71–4.2(a). A resource that is classified as excludable is not considered in determining Medicaid eligibility. *N.J.A.C.* 10:71–4.4(a).

As amended by the Medicare Catastrophic Coverage Act (MCCA) of 1988, *Pub.L. No.* 100–360, 102 *Stat.* 683, the Medicaid Act[4] seeks to achieve two separate purposes. First, Congress sought to maximize the income and assets of a couple to support the institutionalized spouse. Congress also "sought to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance. . . . To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." *Wisconsin Dep't of Health and Family Servs. v. Blumer,* 534 *U.S.* 473, 480, 122 *S.Ct.* 962, 967, 151 *L.Ed.*2d 935, 944 (2002). A community spouse's income "shall [not] be deemed available to the institutionalized spouse." 42 *U.S.C.A.* § 1396r–5(b)(1). With respect to a couple's resources, for purposes of establishing the institutionalized spouse's Medicaid eligibility, a portion of the couple's assets is reserved for the

---

[4] 42 *U.S.C.A.* §§ 1396 to 1396v.

benefit of the community spouse. 42 *U.S.C.A.* § 1396r–5(c)(2). The CSRA is determined by calculating the total of all the couple's resources, whether jointly or separately owned, as of the time of the institutionalized spouse's institutionalization. *Blumer, supra,* 534 *U.S.* at 482, 122 *S.Ct.* at 968, 151 *L.Ed.*2d at 945. Half of that total is then allocated to each spouse, subject to a ceiling indexed for inflation. *Ibid.* The CSRA is considered unavailable to the institutionalized spouse in the eligibility determination, but all resources above the CSRA must be spent before eligibility is achieved. *Id.* at 482–83, 122 *S.Ct.* at 968–69, 151 *L.Ed.*2d at 945–46. As part of the Omnibus Budget Reconciliation Act (OBRA) of 1993, *Pub.L. No.* 103–66, 107 *Stat.* 312, more stringent requirements were put in place to restrict the ability of individuals to shelter resources in order to qualify for Medicaid, including tighter rules regarding the divesture of assets. 42 *U.S.C.A.* § 1396p.

An applicant is subject to a period of Medicaid ineligibility if the applicant, or his or her spouse, has disposed of an asset for less than fair market value during a "look back" period of time prior to the date of the application, generally thirty-six months. 42 *U.S.C.A.* § 1396p(c)(1)(A)(B)(i); *N.J.S.A.* 30:4D–3i(15)(b); *N.J.A.C.* 10:71–4.7(a). An individual remains eligible for medical assistance if the assets in question "were transferred from the individual's spouse to another for the sole benefit of the individual's spouse," and a satisfactory showing is made, "in accordance with regulations promulgated by the Secretary[,] that ... the individual intended to dispose of the assets either at fair market value" or that "the assets were transferred exclusively for a purpose other than to qualify for medical assistance." 42 *U.S.C.A.* § 1396p(c)(2)(B)(ii); 42 *U.S.C.A.* § 1396p(c)(2)(C)(i) and (ii); *N.J.A.C.* 10:71–4.7(e). In addition, New Jersey Medicaid regulations provide that if the "resource" is transferred at fair market value, the application "shall be processed as usual." *N.J.A.C.* 10:71–4.7(f).

The main question in this appeal is whether the Medicaid Act authorizes the limitation of the resources a couple may invest in an

annuity to the amount of assets which may be retained for use by the community spouse. If not, we must determine whether a commercial irrevocable and non-assignable annuity, the type of annuity involved in this appeal, may be sold on the secondary market rendering it an available asset that in some instances would render the applicant ineligible for benefits.

Under the Medicaid Act, a " 'trust' includes any legal instrument or device that is similar to a trust, but includes an annuity only to such extent and in such manner as the Secretary of the Department of Human Services specifies." 42 *U.S.C.A.* § 1396p(d)(6). There is no federal statute or regulation on the question of whether a state can limit the amount of assets used to purchase an annuity. Therefore, since the Medicaid Act neither authorizes nor prohibits capping the amount of assets that may be utilized to purchase a commercial annuity by and for the community spouse, the federal agency's construction of the statute, and whether its construction is a "permissible" one, needs to be examined.

Congress explicitly delegated to the Center for Medicaid and Medicaid Services (CMS), by way of the Secretary of Health and Human Services, exceptionally broad authority to define eligibility requirements for Medicaid, consistent with the statutory scheme and the reasonable exercise of the delegated power. *Schweiker v. Gray Panthers*, 453 *U.S.* 34, 43, 101 *S.Ct.* 2633, 2639, 69 *L.Ed.*2d 460, 469–70 (1981). Pursuant to that power, CMS, on December 13, 1994, issued Transmittal No. 64 as part of its State Medicaid Manual. With respect to annuities, Transmittal No. 64 provides:

The annuity may or may not include a remainder clause under which, if the annuitant dies, the contracting entity converts whatever is remaining in the annuity into a lump sum and pays it to a designated beneficiary.

Annuities, although usually purchased in order to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the

annuity is commensurate with a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound.

... If the individual is not reasonably expected to live longer than the guarantee period of the annuity, the individual will not receive fair value for the annuity based on the projected return. In this case, the annuity is not actuarially sound and a transfer of assets for less than fair market value has taken place, subjecting the individual to a penalty.

The key criterion with respect to Transmittal No. 64 is actuarial soundness. *Mertz, supra,* 155 *F.Supp.*2d at 419. If the annuity can be determined to be "actuarially sound," then it is a purchase for fair market value. *Ibid.*

In addition, the record disclosed an agency practice of responding to inquiries from public agencies and private persons regarding the interpretation and implementation of the Medicaid Act. *See Johnson v. Guhl,* 166 *F.Supp.*2d 42, 48–49 (D.N.J.2001) (Agency commonly issues policy transmittals to states and executes letters in response to private and public inquiries regarding the application of federal Medicaid statute. Here, an agency employee executed letter to private attorney regarding the agency's policy on the treatment of a couples' assets transferred to a trust), *aff'd,* 357 *F.*3d 403 (3d Cir.2004).

A letter from Thomas Hamilton, the director of the program in CMS in charge of Medicaid implementation and oversight, to a private party directly addresses the 2001 New Jersey regulations. Dated October 21, 2002, he stated that the Medicaid Act did not support either *N.J.A.C.* 10:71–4.10(f), which requires designation of the State of New Jersey as the first remaining beneficiary, or *N.J.A.C.* 10:71–4.10(p)2i. He stated:

We understand and appreciate New Jersey's efforts to conserve public funds by attempting to limit the amount of resources that can be sheltered in annuities. However, the Federal Medicaid statute does not support either of the specific State policies [*N.J.A.C.* 10:71–4.10(f) or –4.10(p)2i] cited in your letter.

\* \* \*

Similarly, we have addressed on several occasions the issue of limiting the amount of a couple's resources that can be used to purchase an annuity for the benefit of the community spouse to a maximum of [the CSRA]. Although we have not addressed this issue specifically with regard to the New Jersey Medicaid

program, our other correspondence on the matter has made it clear that the Federal Medicaid statute does not permit such a limitation.

Following oral argument, DMAHS submitted to this court correspondence between it and the federal agency concerning the treatment of commercial annuities. It relies on the October 20, 2003 letter from Glenn Stanton, Acting Director of the Disabled and Elderly Health Programs Group, which presumably responded to the January 28, 2003 letter from the DMAHS Director. In her letter, the DMAHS Director inquired whether commercial irrevocable and non-assignable annuities could be considered countable resources. In the course of her letter, the Director stated, "we believe that these annuities may be sold albeit at a reduced value. We have provided [a staff member] with numerous Internet web sites that offer to purchase annuity income streams from individuals. We believe that there is a viable secondary market for such annuities." Not surprisingly, Stanton responded that "we fully concur with your position that *if an annuity can be sold,* the basic rules concerning treatment of resources require that the fair market value of an annuity that can be sold is countable as a resource in determining eligibility." (emphasis supplied).

If a statute speaks clearly to the precise question at issue, the courts "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 *U.S.* 837, 842–43, 104 *S.Ct.* 2778, 2781, 81 *L.Ed.*2d 694, 702–03 (1984). That is not this case. If the statute is silent or ambiguous with respect to the specific issue, a court can sustain the agency's determination if it is "based on a permissible construction of the statute." *Id.* at 843, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 703. Usually, this will occur when the agency has enacted a regulation to implement the legislation. *Id.* at 843–44, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 703. In such an instance, considerable weight should be given to an agency's construction of a statutory scheme it is entrusted to administer. *Id.* at 844, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 704.

There is a limited amount of case law that addresses financial instruments such as trusts and annuities and eligibility for Medicaid benefits. *See generally* Elizabeth D. Lauzon, Annotation, Application of "Spousal Impoverishment Provisions" of Medicare Catastrophic Coverage Act, *186* A.L.R. Fed. *437 (2003)*. *We have discovered none which directly address the issue presented in this appeal. There are two cases, however, which are instructive.*

In *Mertz, supra,* 155 *F.Supp.*2d at 418–19, a Medicaid applicant sought injunctive relief by way of a declaratory judgment that the Pennsylvania Department of Welfare's decision to delay her eligibility for Medicaid for two years due to her husband's purchase of annuities with joint assets was illegal, null and void. *Ibid.* The Department made an express finding of fact that the annuities were purchased for fair market value, but that it could nevertheless penalize the applicant based on a "determination that the purchase of the annuities reflected a transfer of assets for the purpose of qualifying for Medicaid assistance." *Id.* at 419. The court noted that federal law "provides for a period of ineligibility predicated upon a transfer of assets during the look-back period only for transfers made for less than fair market value." *Id.* at 425 (citing 42 *U.S.C.A.* §§ 1396n(c)(1)(A) and (c)(2)). Thus, the court held that because "the transfer was made to a third party for the sole benefit of the community spouse" at fair market value, the transfer could not, "consistent with federal law, be penalized or used to impose a period of ineligibility." *Id.* at 426. Nor, according to the court, could the return on the annuities be countable because "federal law provides that no income of the community spouse may be deemed available to the institutionalized spouse." *Id.* at 426–27 (citing 42 *U.S.C.A.* § 1396r–5(b)(1)).

In *McNamara v. Ohio Department of Human Services,* 139 *Ohio App.*3d 551, 744 *N.E.*2d 1216 (2000), the court reviewed a determination of ineligibility based upon an improper transfer of assets to a spousal annuity trust established for the sole benefit of the community spouse. The court held that for Medicaid eligibility purposes the amount of resources that an institutionalized

spouse could transfer to the community spouse was limited to the maximum amount that the community spouse could retain under the CSRA provision. 42 *U.S.C.A.* § 1396r–5(f). Of particular interest to this appeal, however, the court also held that Ohio law distinguished between an annuitized trust and a commercial annuity of the kind purchased by F.K. and H.K. and that the commercial annuity was not subject to the CSRA limitation. *McNamara, supra,* 744 *N.E.*2d at 1221. The court specifically referred to and relied on correspondence between CMS and a private party which noted that once an annuity is purchased, the buyer no longer owns the funds used to purchase it. *Ibid. See also Dean v. Dep't of Health & Social Servs.,* 2000 *WL* 33201237 (Del.Super.Ct.2000) (slip op. at 8–9) (community spouse's purchase of an irrevocable and actuarially sound annuity was an exempt resource for determining the CSRA because such an annuity cannot be liquidated by the community spouse and the community spouse's property right in the annuity is in the form of income and not resources), *aff'd o.b.,* 781 *A.*2d 693, 2001 *WL* 578602 (Del.2001).

DMAHS also directs our attention to the *Estate of George Gross v. North Dakota Department of Human Services,* 687 *N.W.*2d 460 (N.D.2004). The Estate appealed from a judgment affirming a state agency decision that the applicant for Medicaid benefits was ineligible because the total countable assets for his household exceeded the maximum allowed for Medicaid eligibility. The North Dakota Supreme Court held that the agency finding that the community spouse had not made a good faith effort to sell the monthly payments from a non-assignable annuity is supported by a preponderance of the evidence. *Id.* at 466. The court noted that the annuity was actuarially sound. Nevertheless, the court held that it was a countable asset because the income stream is available to the community spouse to defray costs incurred by the institutionalized spouse and was saleable. *Ibid.* Notably, and unlike the annuity at issue in this appeal, the community spouse, as the annuitant, had the right to change the payee at any time. *Id.* at 465.

Furthermore, North Dakota has adopted a regulation which provides that contractual rights to receive money payments are available assets and establishes a rebuttable "presumption that the holder's interest in contractual rights to receive money payments is saleable without working an undue hardship." *N.D. Admin. Code* § 75–02–02.1–30 (2004). Neither of these provisions has been adopted by this State. Thus, DMAHS's reliance on this case is misplaced.

The State also urges our consideration of *Johnson v. Guhl,* 357 *F.*3d 403 (3d Cir.2004). In *Johnson,* the court observed that the state Medicaid agency could have chosen to treat any annuities purchased, whether private or commercial, as countable assets. *Id.* at 411. The financial instrument at issue in *Johnson,* a community spouse annuity trust, is not equivalent to the irrevocable and non-assignable annuity in this case. Therefore, we decline to give any weight to the observation that this State may choose to treat commercial annuities as countable assets. The observation is dictum unaccompanied by an analysis of the statutory and regulatory scheme and any consideration of the opinions that form our record on appeal by the person charged with administration and oversight of the Medicaid scheme.

A federal administrative agency's interpretation warrants some deference when expressed less formally than a regulation, as long as that agency has a delegated authority to administer the statute and the views are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come before a judge. *Skidmore v. Swift & Co.,* 323 *U.S.* 134, 140, 65 *S.Ct.* 161, 164, 89 *L.Ed.* 124, 129 (1944). The weight of such a judgment in a particular case depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Ibid.* Thus, if an agency has been granted administrative authority for a statute, its interpretation, despite arising in an informal context, will be given

deference as long as it is consistent with prior agency pronouncements and is consistent with the plain language and purposes of the enabling legislation. *Cleary v. Waldman,* 167 *F.*3d 801, 808 (3d Cir.), *cert. denied,* 528 *U.S.* 870, 120 *S.Ct.* 170, 145 *L.Ed.*2d 144 (1999).

Because Transmittal No. 64 and the letters in question are less formal interpretations than rulemaking, we utilize the less deferential *Skidmore* standard for review. Such less formal interpretations are entitled to respectful consideration and deference, particularly where the underlying statute, such as the Medicaid Act, suffers from "exposed gaps in its policies, especially if the statute itself is very complex." *Community Health Ctr. v. Wilson–Coker,* 311 *F.*3d 132, 138 (2d Cir.2002). *See New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 576, 384 *A.*2d 795 (1978) (noting that an opinion letter from a federal agency counsel "has been accorded the status of an official administrative interpretation for purposes of judicial deference thereto"). *See also Elizabeth Blackwell Health Ctr. for Women v. Knoll,* 61 *F.*3d 170, 181 (3d Cir.1995) (Health Care Financing Administration directive in an effort to give interpretive guidance to the states in advance of their submission of state Medicaid plans deemed an "interpretive rule"), *cert. denied,* 516 *U.S.* 1093, 116 *S.Ct.* 816, 133 *L.Ed.*2d 760 (1996).

We conclude that Transmittal No. 64 and the Hamilton letters warrant deference. *See McNamara, supra,* 744 *N.E.*2d at 1221. All indicate that the federal agency and its director have given thorough consideration to the role of commercial annuities purchased for community spouses in the Medicaid scheme. Moreover, the views expressed by the administrator charged with administration and oversight of the program have been consistent that the limitation imposed by this State is contrary to federal law. On the other hand, we accord no deference to the October 20, 2003 letter from Acting Director Stanton to the DMAHS Director. By its terms, this letter cannot be considered a definitive statement of policy because it relies on facts supplied by DMAHS and does not

reflect an independent analysis of the factual or legal basis for the proposition that the annuities may be sold.

 Generally speaking, state regulations that are inconsistent with federal law are invalid under the Supremacy Clause. *Knoll, supra,* 61 *F.*3d at 178; *Lewis v. Hegstrom,* 767 *F.*2d 1371, 1375 (9th Cir.1985). A state agency must "act consistently with any applicable federal law, and its regulations, when a federal standard governs, must foster the federal policies." *In re Adoption of Amendments to N.J.A.C. 6:28–2.10,* 305 *N.J.Super.* 389, 402, 702 *A.*2d 838 (App.Div.1997) (citations omitted). While an occasional dissenting view has been expressed, *see, e.g., Brogdon ex rel. Cline v. National Healthcare Corp.,* 103 *F.Supp.*2d 1322, 1339 (N.D.Ga.2000) (doubting that the Supremacy Clause applies to the regulatory scheme promulgated under the Medicaid Act on the ground that the spending power is more in the nature of a contract), it is generally held that the Supremacy Clause applies to the Medicaid Act. *Frazar v. Gilbert,* 300 *F.*3d 530, 550 (5th Cir.2002); *Missouri Child Care Ass'n v. Cross,* 294 *F.*3d 1034, 1040–41 (8th Cir.2002); *Antrican v. Odom,* 290 *F.*3d 178, 188 (4th Cir.), *cert. denied,* 537 *U.S.* 973, 123 *S.Ct.* 467, 154 *L.Ed.*2d 329 (2002); *Knoll, supra,* 61 *F.*3d at 178. Thus, we hold that *N.J.A.C.* 10:71–4.10(p)2i, which caps the amount of funds which may be used to acquire a commercial irrevocable and non-assignable annuity at the CSRA limit, is invalid because it is inconsistent with federal law, and therefore violative of the Supremacy Clause.

The Director of DMAHS nonetheless contends that the annuity in question is a countable resource because it has a market value given that the income stream from the annuity can be sold in exchange for a lump sum payment. However, neither of the cases cited by the Director in support of this proposition, *Owen v. CNA Ins./Continental Cas. Co.,* 167 *N.J.* 450, 771 *A.*2d 1208 (2001) and *In re Spinelli,* 353 *N.J.Super.* 459, 803 *A.*2d 172 (Law Div.2002), involved annuities purchased for income supplementation. *Owen* and *Spinelli* involved structured settlement agreements negotiated to avoid an immediate lump sum payout. *Owen, supra,* 167

*N.J.* at 453, 771 *A.*2d 1208; *In re Spinelli, supra,* 353 *N.J.Super.* at 462, 803 *A.*2d 172. In each case, the non-assignment clauses were held to be unenforceable. *Owen, supra,* 167 *N.J.* at 469–70, 771 *A.*2d 1208; *In re Spinelli, supra,* 353 *N.J.Super.* at 473–74, 803 *A.*2d 172. Notably, in *Owen,* the Court limited its holding to the facts of the case, and did not invalidate non-assignment provisions in structured settlements generally. 167 *N.J.* at 469–70, 771 *A.*2d 1208. *Cf. F.E. v. Div. of Med. Assistance and Health Servs.,* 95 *N.J.A.R.*2d 67 (DMA) (1995) (funds in a fixed term annuity, which could not be returned to applicant except as a monthly annuity, were countable as accessible resources for purposes of determining Medicaid eligibility and, therefore, were excludable because liquid assets were converted to an annuity).

Moreover, the marketability and value of the income stream to H.K. blurs the distinction between resource allocation and income allocation under the federal Medicaid law. Resource allocation is controlled by 42 *U.S.C.A.* §§ 1396r–5(c) and (f). For purposes of establishing the institutionalized spouse's Medicaid eligibility, a portion of the couple's assets, the CSRA, is reserved for the benefit of the community spouse. 42 *U.S.C.A.* § 1396r–5(c)(1) and (2). All resources above the CSRA are considered to be available to the institutionalized spouse. 42 *U.S.C.A.* § 1396r–5(c)(2). A resource is defined as cash or other liquid assets or any real or personal property that an individual, including a spouse, owns and could convert to cash to be used for his or her support and maintenance. 20 *C.F.R.* § 416.1201(a). "If the individual has the right, authority or power to liquidate the property or his or her share of the property, it is considered a resource. If a property right cannot be liquidated, the property will not be considered a resource of the individual (or spouse)." 20 *C.F.R.* § 416.1201(a)(1). Similarly, New Jersey regulations define a resource as "any real or personal property which is owned . . . and which could be converted to cash." *N.J.A.C.* 10:71–4.1(b). In order to be considered in the determination of eligibility, a resource must be "available," and such a resource is considered available to an individual when the person has "the right, authori-

ty, or power to liquidate real or personal property, or his or her share of it." *N.J.A.C.* 10:71–4.1(c)(1).

Income allocation is governed by 42 *U.S.C.A.* §§ 1396r–5(b) and (d). With exceptions not applicable here, no income of the community spouse is deemed available to the institutionalized spouse. 42 *U.S.C.A.* § 1396r–5(b)(1). "The community spouse's income is thus preserved for that spouse and does not affect the determination whether the institutionalized spouse qualifies for Medicaid. In general, such income is also disregarded in calculating the amount Medicaid will pay for the institutionalized spouse's care after eligibility is established." *Blumer, supra,* 534 *U.S.* at 480–81, 122 *S.Ct.* at 967, 151 *L.Ed.*2d at 944.

The resource-income distinction was further highlighted in *Mertz, supra,* where the court held:

> Because at the time of application neither spouse ha[d] an ownership interest in the funds used to purchase such an annuity, the funds are not a countable resource in calculating the CSRA. Because the transfer was made to a third party for the sole benefit of the community spouse, it may not, consistent with federal law, be penalized or used to impose a period of ineligibility.... The return on the annuities is not countable as federal law provides that no income of the community spouse may be deemed available to the institutionalized spouse.

> In short, a couple may effectively convert countable resources into income of the community spouse which is not countable in determining Medicaid eligibility for the institutionalized spouse by purchasing an irrevocable actuarially sound commercial annuity for the sole benefit of the community spouse.

> [*Mertz, supra,* 155 *F.Supp.*2d at 426–27 (citations omitted). *See also Dean, supra,* 2000 *WL* 33201237 (slip op. at 8–10).]

■ Therefore, the irrevocable and non-assignable annuity purchased for the benefit of H.K., the community spouse, cannot be considered a countable resource. H.K. had no ownership interest in the annuity; she was only entitled to the income stream,[5] and nothing in the record indicates that there is a market for that stream. Nor has DMAHS established that an annuitant may sell a commercial annuity, despite its contract terms.

---

[5] We utilize the past tense because we were informed at oral argument that H.K. also died during the pendency of this appeal.

We would also be remiss if we did not mention that the agency's belated focus on the marketability of the annuity contravenes the parties' stipulation at the Fair Hearing before the ALJ that the annuity, as configured, complied with the requirements of the prior regulations. DMAHS took the position that F.K.'s application was denied only because it did not comply with the newly adopted regulation, *N.J.A.C.* 10:71–4.10(p).

Presumably then, F.K.'s application for Medicaid benefits would have been approved but for *N.J.A.C.* 10:71–4.10(p)2i. DMAHS maintains that "the parties did not stipulate that under the regulations in effect at the time of funding the Annuity, the Annuity was an exempt resource or that appellant would have been Medicaid eligible." While DMAHS did not expressly stipulate that F.K.'s application would have been approved but for *N.J.A.C.* 10:71–4.10(p)2i, it is clear that the new regulation was the sole basis for the denial of F.K.'s application. Moreover, there is no evidence in the record supporting the findings of the Acting Director of the existence of a viable secondary annuities market or whether F.K. and H.K. could sell the annuity or the income stream on such a market.

In summary, we hold that *N.J.A.C.* 10:71–4.10(p)2 which caps the amount of funds which an applicant for Medicaid benefits may use to purchase an annuity at the CSRA limit is invalid because it is inconsistent with federal law. We also hold that the alternate basis for denial of eligibility, the availability of a secondary market for commercial irrevocable and non-assignable annuities, is not supported by the facts or law. Therefore, the September 12, 2002 Final Decision, which declared F.K. ineligible for benefits, is reversed.[6]

Reversed.

---

[6] F.K.'s argument that the effective date of the regulation at issue was September 27, 2001, is without merit. By its terms, the regulation was effective immediately on adoption, June 18, 2001. The agency decision to apply the regulations in effect on the date of application for benefits rather than at the time

---

of purchase of the annuity does not deny F.K. due process. *A.H. Robins Co. v.
Dir., Div. of Taxation,* 365 *N.J.Super.* 472, 483–86, 839 *A.2d* 914 (App.Div.2003),
*aff'd,* 182 *N.J.* 77, 861 *A.2d* 131 (2004).